**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**


| | | |
|---|---|---|
| **LIFESCREEN SCIENCES LLC,** | § | |
| | § | **CASE NO. 6:13-CV-091** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **JURY TRIAL REQUESTED** |
| **CORDIS CORPORATION,** | § | |
| | § | |
| **Defendant.** | § | |


## MEMORANDUM OPINION AND ORDER

This claim construction Opinion construes terms in claims 1 and 28 of United States Patent No. 5,709,704 (the "'704 Patent") and claims 19 and 36 of United States Patent No. 6,214,025 (the "'025 Patent"). Plaintiff LifeScreen Sciences LLC ("LifeScreen") alleges Defendant Cordis Corporation ("Cordis") infringes the '704 and '025 Patents (collectively, the "Patents-In-Suit").

## BACKGROUND

LifeScreen filed an Opening Claim Construction Brief (Doc. No. 63). Cordis filed a Responsive Claim Construction Brief (Doc. No. 67). Thereafter, LifeScreen filed a Reply to a (Doc. No. 68). Additionally, the parties submitted a Joint Claim Construction and Prehearing Statement (Doc. No. 54), including a Proposed Claim Construction Charts attached as Exhibits 1 and 2 (Doc. Nos. 108-1, 108-2), as well as a P.R. 4-5(D) Joint Claim Construction Chart (Doc. No. 70-1). A *Markman* Hearing was held on June 19, 2014.

## THE PATENTS

The '025 Patent is a continuation-in-part of United States Patent No. 6,013,093, which is

a continuation-in-part of the '704 Patent. *See* Doc. No. 67 at 3. The specifications of the '704 Patent and '025 Patent contain some identical portions, and are generally similar. *Compare* '704 Patent col. 1:30-50 *with* '025 Patent col. 1:47-67; *compare* '704 Patent FIG. 1 *with* '025 Patent FIG 1. Both Patents-In-Suit claim only various "filters." '704 Patent col. 10:3-20-, 11:40-12:8, 12:9-35; '025 Patent col. 16:49-60, 17:45-58, 18:123-23, 18:40-50. The filters are generally described as being "sized and constructed to be compressed and passed through the vasculature of a patient to be anchored against an inner wall surface of a blood vessel for capturing blood clots in a blood stream passing therethrough." '704 Patent col. 1:30-34; '025 Patent col. 1:47-67.'

Figure 1 of the '704 Patent and '025 Patent generally shows a blood clot filter that "includes a generally cylindrical anchoring portion 12 and a generally conical filtering portion 14 terminating at a closed, distal apical end." '074 Patent col. 4:21-23; '025 Patent col. 5:12-14.



'704 Patent FIG. 1; '025 Patent FIG 1. The cylindrical portion exerts an "outward radial force to anchor the filter in a blood vessel" and the "filtering portion provides a conical meshwork across the blood vessel to catch and retain clots in the blood stream" '704 Patent col. 4:23-25, 4:30-32; '025 Patent col. 5:15-16, 5:21-23. The clots are retained "in the central region of the vessel where the flow velocity is highest and where the most effective clot lysing occurs." '704 Patent col. 3:35-38; '025 Patent col. 4:16-18.

Additionally, the specification of both the '704 and '025 Patents and claims of the '704 Patent also provide that various portions of the filters may be made of nitinol (nickel-titanium alloy), in addition to other "shape memory material[s]." *See, e.g.* '704 Patent. col. 1:68, col. 11:1-2, col. 12:36-37; '025 Patent col. 2:33, col. 3:47-48, col. 16:33-34; Doc. No. 67 at 2. "Shape memory refers to the ability of a [material] to be deformed to hold a shape below [a] transformational temperature, but when heated above its transformational temperature, [to] return to its original pre-deformed shape." Doc. No. 63 at 2.

The '025 Patent also details a filter design not found in in the '704 Patent, demonstrated by 12A. *See* Doc. No. 67 at 3.



'025 Patent FIG 12A. This filter design, which is unique to the '025 Patent, is a "blood clot filter 600 further includ[ing a] filtering portion 614 which is concentrically aligned within lumen 625 of anchoring portion 612." '025 Patent col. 14:45-47; *see* Doc. No. 63 at 2.

**APPLICABLE LAW**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's

intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations,

the inventor's lexicography governs. *Id.* Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The patents-in-suit also contain means-plus-function limitations that require construction. Where a claim limitation is expressed in means-plus-function language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112 ¶ 6. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112(f) "mandates that such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (quoting 35 U.S.C. § 112 ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple inquiries. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "[t]he next step is to determine the corresponding structure described in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Braun*, 124 F.3d at 1424.

## CLAIM CONSTRUCTIONS

[1]. "**generally cylindrical self-expanding body**" ('704 patent, claim 1)

For this term, LifeScreen proposes "[n]o construction is necessary," and in the alternative: "[a] self-expanding object generally having the form or shape of a cylinder." Doc. No. 70-1 at 3; *see* Doc. No. 63 at 13. Cordis proposes "an object which has a generally cylindrical shape and is itself capable of self-expansion, without requiring attachment to a filtering portion." Doc. No. 70-1 at 3; *see* Doc. No. 67 at 10. The parties' central disagreement

involves whether the anchoring self-expansive force is provided exclusively by the cylindrical portion, or if the self-expansive force of the filtering portion may also contribute to the anchoring of the entire blood clot filter.  *See* '704 Patent col. 4:33-34 (as shown in Figure 1 of the '704 Patent, above, the "[f]iltering portion" is indicated by reference number 14 and the "[c]ylindrical portion" is indicated by reference number 12).

Specifically, Cordis argues that "it must be the combination of the structure and material in the ***anchoring portion*** that is capable of self-expansion, urging the filter to expand the anchor against the vessel wall."  Doc. No. 67 (emphasis added) (citing the '704 Patent col. 1:34-43, 2:32-39, 7:43-48).  LifeScreen replies that Cordis seeks to import an improper negative limitation, and that "the specification [does not] explicitly teach that the conical filtering portion ***cannot*** provide any support to the filter in the vessel."  Doc. No. 68 (citing '704 Patent col. 3:12-14) (emphasis original).

Cordis expressly states that it "does not argue that the filtering portion may not ***theoretically*** provide some incidental self-expansive force."  Doc. No. 67.[1]  In fact, the '704 Patent expressly provides that "the filter may be formed of a temperature-sensitive shape memory material" and that "at least a portion of the filter may be formed from nitinol wire." '704 Patent col. 10:48-49, 10:54-44, *see* '704 Patent col. 4:42-43 (describing "nitinol wire" as a "resilient material" that may provide expansive force); *see* Doc. No. 63 at 11 ("[T]he conical filtering portion inherently provides some self-expansive force on its own and to the overall device."); *see also* '704 Patent col. 8:61-66 (The filtering portion could inherently provide some expansive force in conjunction with the anchoring portion because "[l]egs 176 of filtering portion . . . [are] formed from the continuation of a single elongated strand (formed from, e.g.,

---

[1] In fact, Cordis notes that its construction, provided above, is different from its original proposal to accommodate for the fact that it now recognizes that "the filtering portion may [] ***theoretically*** provide some incidental self-expansive force."  Doc. No. 67 at 12.

nitinol wire) from the anchoring portion."); '025 Patent col. 9:59-61 ("[E]ach leg 176 is formed from the continuation of a single elongated strand (formed from, e.g., nitinol wire) from the anchoring portion."). Thus it is clear from Cordis' admission and the specification that the "filtering portion" *may provide some* self-expansive force. *See* Doc. No. 63 at 12 ("[T]he specification clearly states, with respect to one embodiment, that 'the filtering portion does not *need* to provide anchoring radial force,' however there is no statement that specifies that the filtering portion *cannot* provide anchoring radial force.") (emphasis original) (citing '704 Patent col. 4:58-59); '704 Patent col. 6:12-14 ("The number of cells in the anchoring portion *and* in the filtering portion may be varied to achieve larger sizes or higher [outward radial expansion] forces.") (emphasis added).[2] Accordingly, the Court finds no construction is necessary for "generally cylindrical self-expanding body."

[3]. "**said resilient material urges said cylindrical body to radially expand and to thereby apply anchoring radial force**" ('704 patent, claim 1)

For this term, LifeScreen proposes "[n]o construction is necessary," and in the alternative: "[t]he elastic properties of the material apply outward force to expand the cylindrical body against the inner wall of the blood vessel, thereby applying anchoring radial force to resist migration." Doc. No. 70-1 at 3-4; *see* Doc. No. 63 at 16. Cordis proposes "the generally cylindrical body must be urged into an expanded configuration and thereby apply the necessary anchoring radial force by the resilient material of the anchoring portion, rather than being urged into an expanded configuration by the filtering portion." Doc. No. 70-1 at 3-4; *see* Doc. No. 67

---

[2] The Court need not address arguments relating to alleged disavowals involving the Greenfield and Lefebvre prior art references in view of the plain language of the specification and the absence of a clear and unmistakable disavowal. *See 3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325 (Fed. Cir. 2013) ("[I]n order for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable.").

at 5.  The parties' central disagreement involves the same negative limitation issue as addressed above with respect to "generally cylindrical self-expanding body."[3]

Cordis provided an earlier construction for this term: "generally cylindrical body must be urged into an expanded configuration and thereby apply the *sole source* of anchoring radial force by the resilient material."  Doc. No. 63 at 16 (emphasis added)  (LifeScreen argues that Cordis' first proposed construction "[y]et again [] proposes negative limitations regarding the source of the anchoring radial force that are unwarranted by the plain language of the claims.").  In its responsive claim construction brief, Cordis retreats from this position, recognize[ing] the possibility that the filtering portion may provide some incidental anchoring radial force."  Doc. No. 67 at 10.[4]

Accordingly, in view of the Court's finding with respect to "generally cylindrical self-expanding body," that the filtering portion may provide some expansive force in conjunction with the anchoring portion such that the filtering portion may contribute to the total force necessary to anchor, no construction is necessary for "said resilient material urges said cylindrical body to radially expand and to thereby apply anchoring radial force."

[4]. "**radially expandable body**" ('025 patent, claims 19 and 36)

For this term, LifeScreen proposes "[n]o construction is necessary," and in the alternative: "[a]n object expandable from a smaller diameter condition to a larger diameter condition outward from a central axis."  Doc. No. 70-1 at 4; *see* Doc. No. 63 at 17.  Cordis proposes "an object that is self expandable from a smaller diameter in a compressed condition to a larger diameter in an expanded condition, without requiring attachment to a filtering portion."

---

[3] At the *Markman* Hearing, the parties agreed that their argument with respect to term 1, "generally cylindrical self-expanding body," also sufficiently covered terms 3, 4, 5, and 7.  No argument specific to terms 3, 4, 5, or 7 was presented at the *Markman* Hearing.

[4] In the very next sentence Cordis explains that its most recent proposed construction merely replaces "sole source" with "force necessary to achieve expansion and anchoring."  Doc. No. 67 at 10.

Doc. No. 70-1 at 4; *see* Doc. No. 67 at 13.  The parties' central disagreement involves the same negative limitation issue as addressed above with respect to "generally cylindrical self-expanding body."[5]

Here, Cordis argues that, "similar to the construction of 'generally self-expanding body" discussed above [], it must be the combination of structure and material in the anchoring portion itself that is radially expandable to anchor the filter against the wall of the vessel."  Doc. No. 67 at 13-14.  Cordis has offered "an amended proposal" that excludes "the filtering portion [from being] necessary to expand the device."  Doc. No. 67 at 14.  LifeScreen's Reply argues, in part that, "[s]imply identifying the generally cylindrical anchoring portion as being self-expanding cannot require that the anchoring portion expand without connection to the filtering portion, when, in fact, the two portions are connected and operate together as part of the whole device."  Doc. No. 68 at 6.

As explained above with respect to "generally cylindrical self-expanding body," the filtering portion *may* provide some self-expansive force which *may* contribute to the total force necessary to anchor the entire blood clot filter.  Accordingly, in view of the Court's finding with respect to "generally cylindrical self-expanding body," no construction is necessary for "radially expandable body."

[5]. "**axially aligned elongate strands which cooperate to urge the anchoring portion into a generally cylindrical expanded configuration**" ('025 patent, claim 19)

For this term, LifeScreen proposes "[n]o construction is necessary," and in the alternative: "[t]he elongate strands are aligned with the longitudinal axis of the anchoring portion when in a compressed state, and urge the anchoring portion to expand to a generally cylindrical

---

[5] At the *Markman* Hearing, the parties agreed that their argument with respect to term 1, "generally cylindrical self-expanding body," also sufficiently covered terms 3, 4, 5, and 7.  No argument specific to terms 3, 4, 5, or 7 was presented at the *Markman* Hearing.

expanded condition." Doc. No. 70-1 at 4; *see* Doc. No. 63 at 18. Cordis proposes "the axially aligned elongate strands in the anchoring portion are connected together so that they can cooperate to urge the anchoring portion into a generally cylindrical expanded configuration, rather than being urged into an expanded configuration by the filtering portion." 70-1 at 4; *see* Doc. No. 67 at 14. The parties' central disagreement involves the same negative limitation issue as addressed above with respect to "generally cylindrical self-expanding body."[6]

Here, Cordis has again "amended its tentative, originally proposed construction of the above disputed term."[7] Doc. No. 67 at 16; *see* Doc. No. 67 at 16. As with "generally cylindrical self-expanding body," Cordis' argument is that "it must be the combination of structure and material within the anchoring portion that urges the filter to expand to a generally cylindrical structure." Doc. No. 67 at 16.[8] Thus, Cordis again seeks a construction which would exclude the possibility that any of self-expanding force is provided by the filtering portion. As noted above, LifeScreen generally replies that "[s]imply identifying the generally cylindrical anchoring portion as being self-expanding cannot require that the anchoring portion expand without connection to the filtering portion, when, in fact, the two portions are connected and operate

---

[6] At the *Markman* Hearing, the parties agreed that their argument with respect to term 1, "generally cylindrical self-expanding body," also sufficiently covered terms 3, 4, 5, and 7. No argument specific to terms 3, 4, 5, or 7 was presented at the *Markman* Hearing.

[7] Cordis originally proposed a significantly different construction. Doc. No. 63 at 18 (Cordis originally proposed: "[t]he elongate strands define at least one circumferential ring of cells in the anchoring portion which cooperate with each other through fixed regions of contact by urge the anchoring portion into a generally cylindrical expanded configuration, rather than being urged into an expanded configuration by the filtering portion."); *see* Doc. No. 67 at 16 ("Cordis has therefore amended its tentative, originally proposed construction of the above disputed term."). Unfortunately, LifeScreen's Opening Claim Construction Brief focused on the "ring of cells" element not found in Cordis' revised construction. LifeScreen did not expressly address the changes to Cordis' proposed construction in its Reply Brief, and no argument was expressly presented addressing this specific term at the *Markman* Hearing. Doc. No. 63 at 18-19; *see* Doc. No. 68 at 1-8.

[8] Cordis also argues that the '025 Patent "disparages the design of U.S. Patent No. 5,344,427" to support the notion that "the various 'elongated strands' that make up the anchoring portion via 'fixed regions of contact' or 'fixed coupling' . . . are *able* to '*cooperate*' with one another to urge the anchoring portion to expand, and to stabilize it within the blood vessel." Doc. No. 67 at 15. While this argument bolsters the undisputed notion that the "axially aligned elongated strands in the anchoring portion" *may* "cooperate to urge the anchoring portion into a generally cylindrically expanded configuration," it does nothing to also preclude the "filtering portion" from also possibly contributing to the "coopera[tive effort] to urge the anchoring portion into a generally cylindrically expanded configuration." Doc. No. 67 at 14.

together as part of the whole device." Doc. No. 68 at 6; *see* '025 Patent col. 3:5-8 ("The elongated strands are preferably selected to have sufficient rigidity to maintain the generally conical shape of the filtering portion.").

As explained above with respect to "generally cylindrical self-expanding body," the filtering portion *may* provide some self-expansive force which *may* contribute to the total force necessary to anchor the entire blood clot filter. Accordingly, in view of the Court's finding with respect to "generally cylindrical self-expanding body," no construction is necessary for "axially aligned elongate strands which cooperate to urge the anchoring portion into a generally cylindrical expanded configuration."

[7]. "**axially aligned elongate strands which define wall portions of closed cells and which cooperate to form said cylindrical shape**" ('025 patent, claim 36)

For this term, LifeScreen proposes "[n]o construction is necessary," and in the alternative: "[t]he elongate strands define wall portions of closed cells, and are aligned with the axial lumen extending through the anchoring portion, cooperate to form a cylindrical shape defined by the elongate strands." Doc. No. 70-1 at 4-5; *see* Doc. No. 64 at 21. Cordis proposes "the axially aligned elongate strands in the anchoring portion which define wall portions of closed cells are connected together such that they can cooperate to form and prevent distortion of a generally cylindrical shape, rather than being maintained in that shape by the filtering portion." Doc. No. 70-1 at 4-5; *see* Doc. No. 67 at 23. The parties' central disagreement involves the same negative limitation issue as addressed above with respect to "generally cylindrical self-expanding body."[9]

---

[9] At the *Markman* Hearing, the parties agreed that their argument with respect to term 1, "generally cylindrical self-expanding body," also sufficiently covered terms 3, 4, 5, and 7. No argument specific to terms 3, 4, 5, or 7 was presented at the *Markman* Hearing.

LifeScreen's argument with respect to this term begins by noting that "[t]his claim term is similar to term 5 discussed above." Doc. No. 63 at 21. Cordis' argument starts by acknowledging that "[a]s with the disputed term concerning the anchoring portion disclosed in claim 19, above, Cordis' proposed construction of claim 36 is driven by . . . [the notion that] the elongated strands forming the anchoring portion [are required to] to 'cooperate'' with one another to establish the anchoring portion's generally cylindrical form." Doc. No. 67 at 23-24.

As explained above with respect to "generally cylindrical self-expanding body" and "axially aligned elongate strands which cooperate to urge the anchoring portion into a generally cylindrical expanded configuration," the filtering portion *may* provide some self-expansive force which *may* contribute to the total force necessary to anchor the entire blood clot filter. Accordingly, in view of the Court's findings with respect to "generally cylindrical self-expanding body" and "axially aligned elongate strands which cooperate to urge the anchoring portion into a generally cylindrical expanded configuration," no construction is necessary for "axially aligned elongate strands which define wall portions of closed cells and which cooperate to form said cylindrical shape."

[6]. "**concentrically aligned with said axial lumen of**" ('025 patent, claim 19) / "**concentrically aligned with**" ('025 patent, claim 36)

All issues with respect to this term relate to "concentrically aligned." For this term, LifeScreen proposes "[n]o construction is necessary," and in the alternative: "[a]ligned with the anchoring portion about the axial lumen." Doc. No. 70-1 at 5; *see* Doc. No. 63 at 19-20. Cordis proposes "concentrically aligned within the axial lumen of." Doc. No. 70-1 at 5; *see* Doc. No. 67 at 18. The parties' disagree as to the scope of the term "with" as used in Claims 19 and 36 of the '025 Patent.

Cordis argues that the '025 Patent uses "concentrically aligned" "to only refer to embodiments where the filtering portion is centered *within the lumen* of the anchoring portion (as shown in [] Fig. 12A)."  Doc. No. 67 at 19 (emphasis original).  LifeScreen argues that Cordis' use of "'within' is a clear attempt to improperly limit the 'concentrically aligned' to one specific embodiment of the specification."  Doc. No. 63 at 20; *see* Doc. No. 68 at 6-7 (LifeScreen replies that Cordis is seeking to "change 'with' to 'within" and argues that Cordis proposed construction "improperly relies on the 'alternate embodiment' of Figures 12 and 12B to limit the claims to this example.")



'025 Patent FIG. 12A.  Specifically, LifeScreen points out that in addition to Figure 12, above, which shows a "filtering portion 614 which is concentrically aligned *within* lumen 625," the '025 Patent "discloses no less than eight embodiments, including the specification and claims directed to Figs. 1-1C, 6-6B, 7-7B, 8-8B, 9-9A, 10-10A, 11-11A, and 12-12A" '025 Patent col. 14:46-47 (emphasis added); Doc. No. 63 at 20.  By way of example, Figure 1 clearly shows a "[f]iltering portion 14" outside of but axially aligned relative to "anchoring portion 12."  '025 Patent col. 5:12-13.



'025 Patent FIG. 1. Figure 1A further demonstrates that the filtering portion is centered along an axis running perpendicularly through the center of the circumference of the anchoring portion (i.e. concentrically aligned with).



'025 Patent FIG. 1A.

Thus, it is apparent that Claims 19 and 36 of the '025 Patent cover both: (1) the concentric alignment of the filter portion **with** the anchoring portion, wherein the filter portion resides **outside of** the axial lumen of the anchoring portion as demonstrated in Figure 1; as well as (2) the concentric alignment of the filter portion **with** the anchoring portion, wherein the filter portion resides **inside of** the axial lumen of the anchoring portion as demonstrated in Figure 12A. Accordingly, in view of the Court's resolution of the claim scope issue, no construction is necessary for the terms "concentrically aligned with said axial lumen of" and "concentrically aligned with."

[8]. **"cylindrical anchoring means"** ('704 patent, claim 28)

For this term, Cordis argues this term is subject to 35 U.S.C. §112(f) and proposes the function is "anchoring the filter against the inner wall surface of blood vessel" and the structure is "a generally cylindrical object composed of a ring of circumferentially arranged neighboring cells which are fixedly joined together." Doc. No. 70-1 at 5; Doc No. 67 at 26. LifeScreen argues the term is not subject to 35 U.S.C. §112(f) and accordingly proposes "[a]n anchoring portion comprising a generally cylindrical body." Doc. No. 63 at 23; *see* Doc. No. 70-1 at 5. Additionally, LifeScreen provides that "[i]f the Court determines that 35 U.S.C. §112(f) applies, then: [the function is] anchoring the filter against an inner wall surface of a blood vessel; [and the structure is] a generally cylindrical shaped body having elongate strands concentrically aligned about a central axis, and equivalents thereof." Doc. No. 63 at 23; *see* Doc. No. 70-1 at 5. Thus the parties' central disagreement is whether 35 U.S.C. §112(f) applies.

Cordis argues the mere use of "'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandates for means-plus-function clauses." Doc. No. 67 at 26. LifeScreen argues the "'means' term[ may be] overcome any presumption that attaches by virtue of the presences of the word 'means'" Doc. No. 63 at 22. Specifically, LifeScreen argues that "[n]either of the terms discussed herein recite a function specifically associated with the 'means' terms, thus satisfying the first manner of overcoming the presumption," and that "each term recites sufficient structure to independently overcome the presumption." Doc. No. 63 at 22 (citing *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1353, 1361 (Fed. Cir. 2004)).

The section of Claim 28 relating to "cylindrical anchoring means" recites, in its entirety: "cylindrical anchoring means having proximal and distal ends and defining an axial direction and having a structure of variable size diameter expandable from a low-profile compressed condition to a large profile expanded condition." '704 Patent col. 11:45-49. Nowhere does the part of

16

Claim 28 relating to "cylindrical anchoring means" recite any specific function, though it does literally recite "structure," including a "variable size diameter expandable from a low-profile compressed condition to a larger profile expanded condition." *Id*. Thus, it is apparent that the structure for "anchoring" is the "cylindrical" portion "having a proximal and distal ends and defining an axial direction [that is] of variable size diameter expandable from low-profile compressed configuration to a large profile expanded condition," as specified in the claim. *Id*. Moreover, Cordis' argument that the function is the "'***anchoring*** means' [that] anchors," overlooks that immediately preceding "cylindrical," which is an explicit reference to the "[c]ylindrical portion" structure identified throughout the specification, including by reference number 12 in Figure 1 of the '704 Patent. Doc. No. 67 at 27 (emphasis original).

Accordingly, in the absence of any function, and significant claimed structure, the Court finds that this term is not subject to 35 U.S.C. § 112(f), and no construction is necessary.

[9]. "**conical filtering means**" ('704 patent, claim 28)

For this term, Cordis argues this term is subject to 35 U.S.C. §112(f) and proposes the function is "filtering the blood by capturing blood clots in a blood stream passing therethrough" and the structure is " [a] single conical filter formed from spirally arranged wires or rings of cells coupled to the distal end of the anchoring portion." Doc. No. 70-1 at 5; Doc. No. 67 at 29. LifeScreen argues that this claim term is not subject to 35 U.S.C. §112(f) and accordingly proposes "[g]enerally conical filtering portion." Doc. No. 63 at 24; *see* Doc. No. 70-1 at 5. Additionally, LifeScreen provides that "[i]f the Court determines that 35 U.S.C. §112(f) applies, then: [the function is] filtering blood by capturing blood clots in a blood stream passing therethrough; [and the structure is] a generally cone shaped body having elongated strands, and equivalents thereof." Doc. No. 63 at 24; *see* Doc. No. 70-1 at 5. Thus the parties' central disagreement is whether 35 U.S.C. §112(f) applies.

"Like 'cylindrical anchoring means,' [LifeScreen] argues 'conical filtering means' also does not disclose a specific function . . . [and[ discloses sufficient structure." Doc. No. 63 at 24. Cordis responds that "the function is explicit in the term '*filtering* means,'" . . . [and that] the use of 'generic structural terms' such as '*portion*' provides no more detail as to structure than 'conical filtering **means**'" Doc. No. 67 at 29 (emphasis original) (citing *MIT v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006)). As with "cylindrical anchoring means," Cordis omits the full extent of structure recited in the claim, and fails to address the "conical" which precedes "filtering means" and overlooks the extensive structure recited within the claim itself. '704 Patent col. 12:1.

Specifically, the relevant portion of Claim 28 recites, in its entirety: "conical filtering means axially aligned with said generally cylindrical body, the filtering means having an open proximal end coupled to the distal end of said anchoring portion and having an apical distal end." '704 Patent col. 12:1-8. Thus, it is apparent from the claim language itself that the structure includes at least "an open proximal end coupled to the distal end of said anchoring portion and having an apical distal end." '704 Patent col. 12:2-8. Moreover, Cordis' argument that the function is the "'*filtering* means'" overlooks that preceding recitation of "conical," which is an explicit reference to the "conical structure" identified, for example, by reference numbers 22, 24, and 26, which are the rings forming the conical structure in Figure 1 of the '704 Patent. Doc. No. 67 at 29 (emphasis original); *see* '704 Patent col. 1:54 (referring to a "conical structure"); *id.* col. 4:54-62 ("Conical filtering portion 14 is constructed form a series of rings (22, 24, 26) of relatively loosely coupled cells . . . the material substance forming the conical structure has sufficient structural integrity to prevent large clots in the blood flow from displacing the filtering structure.")

Accordingly, in the absence of any function, and significant claimed structure, the Court finds that this term is not subject to 35 U.S.C. § 112(f), and no construction is necessary.

[1]. "**generally cylindrical body**" ('704 patent, claim 28)

As agreed in the parties' Joint Claim Construction Chart (Doc. No. 70), "generally cylindrical body" is construed as "an object which has a generally cylindrical shape." Doc. No. 70-1 at 6.

[2]. "**structure of variable size diameter expandable from a low-profile compressed condition to a larger profile expanded condition**" ('704 patent, claims 1 and 28)

As agreed in the parties' Joint Claim Construction Chart (Doc. No. 70), no construction is necessary for "structure of variable size diameter expandable from a low-profile compressed condition to a larger profile expanded condition." Doc. No. 70-1 at 6.

## CONCLUSION

.

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above.

**So ORDERED and SIGNED this 12th day of August, 2014.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE